# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WILLIAM L. FRY,

    **Plaintiff,**

    **v.**                          **Case No. 18-CV-1573**

ASCENSION HEALTH MINISTRY SERVICES
d/b/a COLUMBIA ST. MARY'S,

    **Defendant.**

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William Fry sues his former employer, Ascension Health Ministry Services, d/b/a Columbia St. Mary's ("Columbia" or the "hospital"), for discrimination based on sexual orientation in violation of Title VII of the Civil Rights Act of 1964.[1] Columbia moves for summary judgment dismissing Fry's complaint. For the reasons explained below, Columbia's motion is granted and this case is dismissed.

---

[1] In Fry's second amended complaint, he sued Columbia for discrimination based on sexual orientation in violation of Title VII and 42 U.S.C. § 1981 (Count One), religious discrimination in violation of Title VII and the First Amendment (Count Two), retaliation for opposing sex and religious discrimination in violation of Title VII and § 1981 (Count Three), age discrimination in violation of the Age Discrimination in Employment Act of 1967 (Count Four), negligent supervision (Count Five), and violation of the Wisconsin Fair Employment Act (Count Six). Columbia moved to dismiss Counts Two, Three, Five, Six, and any claims alleged under § 1981 and the First Amendment, pursuant to Fed. R. Civ. P. 12(b)(6). The motion was granted (Docket # 27) and Fry was allowed to proceed on Count One (pursuant to Title VII) and Count Four (ADEA discrimination). Columbia now moves for summary judgment as to Fry's Title VII and ADEA discrimination claims. Fry does not respond to Columbia's motion as to the ADEA claim. As such, Fry concedes this claim and I will only address the Title VII claim for discrimination based on sexual orientation. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned).

## UNDISPUTED FACTS

William Fry was hired to work as a registered nurse in Columbia's Medical/Surgical department in October 2003. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 3, Docket # 36 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 3, Docket # 44.) Fry voluntarily resigned in about January 2004, but was re-hired by Columbia in May 2005 to work as a registered nurse in Psychiatry. (*Id.* ¶¶ 4–5.) Fry was transferred to a full-time position as a Clinic Triage Registered Nurse for Ascension's Northpoint Medical Clinic in January 2006 and in August 2007 was promoted to RN Clinic Coordinator for Ascension's Columbia East Clinic. (*Id.* ¶¶ 6–7.) In July 2008, Fry was promoted to Clinic Manager for Ascension's Prospect Medical Commons. (*Id.* ¶ 8.) In August 2011, Fry "wanted to get back into mental health" and asked if any mental health nursing positions were available. (*Id.* ¶ 9.) Fry was given a position as Clinical Nurse 2 in Psychiatry at Columbia. (*Id.*) In April 2012, Fry was promoted to Manager of Patient Services for the Behavioral Health units for the Columbia Hospital in Milwaukee and for Columbia St. Mary's Ozaukee, another hospital in the Ascension Health family. (*Id.* ¶ 10.) A few months later, Fry was promoted to Director of Patient Services for Behavioral Health. (*Id.* ¶ 11.)

As Director of Behavioral Health, Fry was responsible for inpatient and outpatient Behavioral Health services at Columbia and Columbia St. Mary's Ozaukee. (*Id.* ¶ 12.) Fry's promotion was the result of his suggestion to eliminate an outside contractor and to hire two managers at each location to report to Fry. (*Id.* ¶ 13.) Fry selected Pamela Elgin to be the manager of Outpatient Behavioral Health and selected Susan Leuck to be the manager of Inpatient Behavioral Health. (*Id.* ¶¶ 14–15.) In February 2017, Katherine McEwen became Vice President of Patient Care and Fry's direct supervisor. (*Id.* ¶ 16.)

In 2016, Columbia announced a new policy that would require persons holding the position of Director to have a master's degree as of January 2018. (*Id.* ¶ 18.) Fry did not have a master's degree, and decided to seek a different role before the requirement went into effect in 2018. (*Id.* ¶ 19.) Sometime in 2017, after McEwen became Fry's supervisor, he "put [a] plan into place" to transition to a new role before the master's degree requirement went into effect. (*Id.* ¶ 20.) Fry disliked reporting to McEwen because he believed she performed poorly in her role. (*Id.* ¶ 21.) Fry requested that a new position be created in his department for him that would have Fry reporting to his then-subordinate, Elgin. (*Id.* ¶ 22.) The new position of clinical nurse was created, and Elgin hired Fry to fill it. (*Id.* ¶¶ 23, 25.) Fry's new position was effective June 3, 2017. (*Id.* ¶ 27.)

The Joint Commission on Accreditation of Healthcare Organizations (the "Joint Commission") is an independent organization that accredits healthcare facilities throughout the country. (*Id.* ¶ 29.) The Joint Commission conducts unannounced on-site surveys of healthcare facilities during pre-planned windows of time every three years. (*Id.* ¶ 30.) A healthcare facility can lose its accreditation (and, therefore, its Medicare funding) if a Joint Commission survey identifies a serious threat to public or patient safety and it is not mitigated within 72 hours. (*Id.* ¶ 31.) The Joint Commission conducted an unannounced survey at Columbia beginning on May 2, 2017. (*Id.* ¶ 32.) Prior to the Joint Commission arriving, Columbia received information regarding certain areas its surveyors would focus on, one of which was suicide risk mitigation in Behavioral Health. (*Id.* ¶ 34.) Columbia was also informed that the Joint Commission had taken an "extreme position" on "ligature risk," (i.e., items that can be used for self-strangulation) and were specifically looking at

ligature risk. (*Id.* ¶ 35.) Based on this information, Fry and his staff performed a "ligature risk assessment" two weeks before the Joint Commissioner's survey of Columbia. (*Id.* ¶ 36.)

On the first day of the survey, the Joint Commission identified various ligature risks in Columbia's Inpatient Behavioral Health Unit. (*Id.* ¶ 37.) After identifying these risks, the Joint Commission began to scrutinize the entire hospital more closely, which resulted in the identification of additional issues in other departments. (*Id.* ¶ 38.) During the survey, the Joint Commission asked Columbia to produce a report regarding safety events by 7:30 a.m. the next morning. (*Id.* ¶ 40.) Fry asserts that McEwen sent him a text message asking him to compile the report at 8:00 p.m. the night before the report was due. (*Id.*) Fry called McEwen and told her that he would arrive to work early the next morning to prepare the report. (*Id.* ¶ 42.)

The next morning, while Fry was working on the report, a surveyor identified a ligature risk on an unattended medical cart in the Inpatient Behavioral Health Unit, and a staff member called Fry to come to the floor where the cart and surveyor were. (*Id.* ¶ 43.) Fry told the staff member to handle the identified risk as he was working on the report McEwen asked him to complete the night before. (*Id.* ¶ 45.) Fry told the staff member that he "can't be in two places at once." (*Id.* ¶¶ 44–45.) The surveyor heard Fry's statement that he "can't be in two places at once" after being called about the cart and suggested to McEwen that it was demonstrative of the cultural problem he observed in Behavioral Health. (*Id.* ¶ 45.) The surveyor also told McEwen that certain problems he observed were due to the department's leadership, and the lead surveyor asked to meet privately with Kelly Elkins (the hospital's president) and McEwen to express concerns about how Fry was interacting with the surveyors. (*Id.* ¶¶ 39, 46.)

Based on issues identified during the survey, the Joint Commission issued an Immediate Threat to Life citation and determined that Columbia met the criteria of a preliminary denial of accreditation. (*Id.* ¶ 47.) The citation and preliminary denial of accreditation posed a serious threat to the hospital's ability to continue operations and required that it develop a 72-hour action plan to preserve its accreditation. (*Id.* ¶ 48.)

The surveyor's comments regarding leadership in Behavioral Health and the preliminary survey findings they shared as the survey was in progress prompted discussion among McEwen, Elkins, and Human Resources representative Eric Andersen about Fry's leadership and engagement in the survey. (*Id.* ¶ 49.) Elkins was prepared to terminate Fry's employment, but McEwen suggested that instead the hospital accelerate by a few weeks Fry's transition to the clinical nursing position that he had created for himself. (*Id.* ¶ 50.) Fry asserts that McEwen labeled Fry's accelerated transition as a "demotion" to look good to the Joint Commission. (*Id.*)

Elkins brought McEwen's suggestion to the hospital's regional president, Travis Andersen, and he ultimately accepted it. (*Id.* ¶ 51.) McEwen communicated the decision to immediately transition Fry to his new clinical role on Friday, May 5, 2017. (*Id.* ¶ 52.) In response, Fry told McEwen that he assumed when he started his new role as a nurse, he would no longer have to work on mitigating any survey issues. (*Id.* ¶ 53.) McEwen answered that she expected Fry to continue to cooperate with the survey regardless of his role and that he would need to continue to demonstrate his commitment to the hospital. (*Id.* ¶ 54.)

In its report, the Joint Commission specifically noted that a previously planned change in leadership was being accelerated to be effective on the final day of the survey as a

mitigation step being taken. (*Id.* ¶ 55.) Fry believed that McEwen was "scapegoating him" and "getting rid" of him to look good to the Joint Commission. (*Id.* ¶¶ 56–57.) Fry wrote to Andersen and Elkins on May 11, 2017, regarding what he described as his "termination for cause" from his director's position. (*Id.* ¶ 58.) Fry suggested as an alternative to immediately transitioning him to the clinical nursing role, that he be left in the director role until June 3, 2017, but with responsibility for only the Outpatient Behavioral Health Unit (where the Joint Commission had made no serious findings) and that the hospital report that he had tendered his resignation so that he could "save face" and take a paid vacation before the transition, as well as continue to satisfy the needs of the Joint Commission and the hospital. (*Id.* ¶ 61.)

On Sunday, May 14, 2017, Elgin texted Fry and McEwen to inform them that her flight home from a trip was cancelled and that she would not be at work the next morning. (*Id.* ¶ 64.) Although he intended to respond only to Elgin, Fry inadvertently sent the following response to both Elgin and McEwen:

> Don't sweat it. I'm not. I'm really done with Kathy's threats or directions for command performances. I don't give a shit if any surveyor shows up tomorrow. Have a doctors appt at 0800, and will show up after that. Travel safely and do what you need to do. You'll always be a friend and I'll try to be a good employee for you. Kathy [McEwen] and Kelly [Elkins] don't scare me anymore [emoji face with tongue sticking out].

(*Id.* ¶ 65–66.) The next morning, McEwen emailed Andersen and Elkins explaining that there had been a new development showing that Fry's commitment to Behavioral Health was not where it needed to be, and quoted Fry's text message. (*Id.* ¶ 67.) McEwen expressed her opinion that the text demonstrated cultural disregard for the Behavioral Health program and recommended Fry's termination based on the potential risk his negativity could have on the hospital's accreditation. (*Id.* ¶ 68.) Fry's text "underscored" for McEwen what she had

been told during the survey regarding Fry's leadership and lack of engagement and made her believe that he lacked commitment and could negatively impact his team. (*Id.* ¶¶ 69–70.) Elkins considered Fry's behavior egregious and agreed with the recommendation to terminate his employment. (*Id.* ¶ 71.) Both Travis Andersen and Eric Andersen also supported that recommendation. (*Id.* ¶ 72.)

Eric Andersen and McEwen met with Fry that same morning to notify him of his termination and give him a termination letter. (*Id.* ¶ 73.) Fry testified that McEwen terminated his employment "in a moment of pique" because he "insulted her." (*Id.* ¶ 74.) On May 16, 2017, Fry wrote a letter to McEwen, Elkins, and Eric Andersen appealing his termination. (*Id.* ¶ 77.) In his appeal, Fry admitted his text was inappropriate, but said he apologized to McEwen and could not see how any harm had been done to the hospital, McEwen, or Elkins. (*Id.* ¶ 78.) In his appeal letter, Fry expressed his belief that his "demotion" was to appease the Joint Commission and that his termination was prompted by his "inappropriate text," but did not claim that he had been discriminated against by anyone on any basis. (*Id.* ¶¶ 80–81.) On May 30, 2017, McEwen and Elkins sent Fry a letter denying his request to be reinstated as a nurse. (*Id.* ¶ 82.)

Fry admits that neither Travis Andersen nor Elkins were aware of his sexual orientation until after his employment ended. (*Id.* ¶ 107.) However, Fry believes McEwen terminated him because he insulted her in a text and could "get away with it" due, in part, to his sexual orientation. (*Id.* ¶ 106.) Fry married his husband in 2014; however, prior to being married, he referred to his husband as his partner. (*Id.* ¶¶ 110–11.) Sometime after McEwen became Fry's supervisor, she used the term "partner" to refer to Fry's husband. (*Id.* ¶ 112.) While Fry repeated the word "husband," he did not ask McEwen to use that

term. (*Id.*) McEwen again used the term "partner" during a second conversation sometime thereafter, and Fry told her that he would prefer if she used the term "husband." (*Id.* ¶ 113.) McEwen never used the term "partner" again to refer to Fry's husband. (*Id.* ¶ 114.) Fry acknowledges that besides referring to his husband as his partner, McEwen never made any comments that Fry considered harassing, derogatory, insulting, disrespectful, or demeaning. (*Id.* ¶ 116.) However, Fry believed that McEwen's failure to use the term "husband" meant that she was "either ignorant or . . . homophobic" and found the use of the term insulting. (*Id.* ¶ 115.) Though Fry admits that he never discussed McEwen's views on same-sex marriage with her and does not know enough about her to judge her motivation for using the word "partner." (*Id.* ¶ 117.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which

would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Fry asserts that he was unlawfully terminated by Columbia on the basis of his sexual orientation, in violation of Title VII. Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that discrimination based on sexual orientation violates Title VII's prohibition against sex discrimination. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1754 (2020) ("An employer who fires an individual merely for being gay or transgender defies the law."). To defeat summary judgment on his discrimination claim, Fry needs to submit evidence from which a reasonable juror could conclude that Columbia fired him because of his sexual orientation. *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell*

*Douglas* burden shifting framework. *Id.* at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, Fry has the initial burden of establishing that (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If Fry satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Fry to submit evidence that the employer's explanation is pretextual. *Id.*

Columbia argues that Fry cannot meet his *prima facie* case for discrimination based on sexual orientation because he cannot establish that he was meeting Columbia's legitimate expectations. (Def.'s Br. at 11, Docket # 35.) Columbia further argues that even if Fry could meet his *prima facie* burden, Columbia has shown a legitimate, non-discriminatory reason for terminating his employment. (*Id.* at 12.) Fry argues that the evidence demonstrates that he was meeting Columbia's legitimate expectations. Fry relies principally on the fact that he worked for Columbia in various positions over the course of approximately twelve years and "went above and beyond to be a model employee." (Pl.'s Resp. Br. at 9, Docket # 45.) He argues that he had "spotless performance reviews" and was "well-respected by his peers, managers, and supervisors." (*Id.*) Fry argues that he successfully completed eleven Joint Commission surveys during his professional career. (*Id.* at 10.)

To the extent Fry relies on his job performance over his twelve years of employment with Ascension Health, for purposes of Title VII's question of whether an employee is meeting his employer's legitimate expectations, the relevant time period is at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but whether the employee was performing well at the time of his termination.") (internal quotation and citation omitted). The Seventh Circuit has stated that in some circumstances, previous employment history may be relevant and probative in assessing performance at the time of termination; however, its utility is generally limited. *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). The *Fortier* court specifically noted that previous employment history, standing alone, cannot create a genuine issue of triable fact when there have been substantial alterations in the employee's responsibilities and supervision in the intervening period. *Id.* Fry relies on this statement from *Fortier* to argue that McEwen made substantial alterations to Fry's responsibilities and supervision during the 2017 Joint Commission survey and that this, somehow, supports his position. (Pl.'s Br. at 8.)

Fry misunderstands the *Fortier* court's statement. The *Fortier* court stated that in certain circumstances, evidence of previous employment history may be relevant and probative in assessing performance at the time of termination; however, this evidence will not create a genuine issue of material fact when there have been substantial alterations in job responsibilities and supervision in the intervening period. In other words, if an employee previously had very positive job performance reviews, but his job responsibilities and

supervision substantially changed in the intervening period, then the prior positive job performance has little probative value in assessing the employee's current job performance because they are essentially different positions. Thus, if, as Fry asserts, McEwen substantially altered his responsibilities during the 2017 Joint Commission survey, then his previous positive performances are irrelevant to whether he was meeting his employer's legitimate expectations at the time of his termination. Furthermore, given the fact that Fry held multiple different positions with different job titles at different locations throughout Ascension Health's network of hospitals and clinics, his previous job performances likely would have very little probative value to his job performance at the relevant time period.

Fry also argues that two colleagues—Leilani Ziller (Director of Accreditation) and Dr. Keith Johnson (a hospital psychiatrist)—spoke well of him and his leadership abilities. (Pl.'s Resp. Br. at 9–10.) Fry asserts that it is "noteworthy to ponder why Defendants failed to cite from either Ms. Ziller's or Dr. Johnson's deposition transcripts," opining that perhaps their testimony "does not fit within the story imagined by Defendants." (*Id.* at 10–11.) But neither Ziller nor Johnson supervised Fry. While Ziller testified, in her opinion, that Fry was not "disengaged" during the survey and was responsive to concerns raised, (Declaration of Annalisa Pusick ("Pusick Decl.") ¶ 3, Ex. 1, Deposition of Leilani Ziller at 75–76), she also testified that she had no employees directly reporting to her (*id.* at 21). Similarly, while Dr. Johnson testified that he believed Fry "was a very hard worker" and "did the best he could," (Pusick Decl. ¶ 4, Ex. 2, Deposition of Kenneth Johnson at 36), he also stated that he was not Fry's supervisor (*id.* at 9). "[T]he general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting [his] employer's

legitimate employment expectations at the time [he] was terminated." *Peele*, 288 F.3d at 329.

Finally, Fry addresses the relevant time period, arguing that during the time immediately preceding the 2017 Joint Commission survey, he "embodied readiness" and "spent six to nine months preparing many areas of clinical quality, documentation review, and safety review, and provided general advice to his team on how to excel during the survey." (Pl.'s Br. at 10.) That may be the case, but it does not negate the fact that the Joint Commission identified multiple safety issues during the survey, issued an Immediate Threat to Life citation, and determined that Columbia met the criteria of a preliminary denial of accreditation (DPFOF ¶ 47) and the surveyor believed, and articulated to Columbia, that certain problems he observed were due to Fry's leadership of the department (*id.* ¶¶ 39, 45–46). Even after this disastrous survey, McEwen still suggested that Fry be allowed to transition to the clinical nursing position that Fry created for himself, albeit a few weeks early, instead of terminating his employment. (*Id.* ¶ 50.) It was only after Fry sent a text stating that he did not "give a shit if any surveyor shows up tomorrow" that finally solidified to Columbia that Fry was not taking the survey results seriously and terminated his employment. (*Id.* ¶ 65–66.) Given this evidence, no rational trier of fact could find that Fry was meeting his employer's legitimate expectations at the time of termination.

Importantly, it is worth noting that beyond the fact that Fry was not meeting his employer's legitimate expectations, he presents absolutely no evidence whatsoever that his termination had anything to do with his sexual orientation. It is undisputed that McEwen, Elkins, Travis Andersen, and Eric Andersen all participated in the decision to terminate Fry's employment. (*Id.* ¶¶ 69–72.) However, Fry acknowledges that two of the decision-

makers—Elkins and Travis Andersen—were not even aware of his sexual orientation until after his employment ended. (*Id.* ¶ 107.) Fry only accuses McEwen of discriminatory animus; however, the evidence he presents to support that accusation consists of two instances of McEwen calling Fry's husband his "partner," a term Fry undisputedly used in the past to refer to his husband prior to their marriage. (*Id.* ¶¶ 110–11.) Fry also admits that when he told McEwen that he would prefer it if she used the term "husband," she never used the term "partner" again. (*Id.* ¶¶ 113–14.) Fry has failed to submit any evidence whatsoever from which a reasonable juror could conclude that Columbia fired him because of his sexual orientation. For these reasons, the defendant's motion for summary judgment is granted.

## CONCLUSION

Fry began this lawsuit alleging several causes of action that had absolutely no basis in law. (Docket # 27 at 10.) After failing to respond to the defendant's motion to dismiss, the Court granted the motion and allowed Fry to proceed on his claims of ADEA discrimination and Title VII discrimination. When the defendant then moved for summary judgment on the two remaining claims, Fry did not even address the ADEA claim and came forward with absolutely no evidence to support his accusation that Columbia discriminated against him based on his sexual orientation. On the record evidence before me, Fry's lawsuit borders on frivolous. Summary judgment is granted in favor of the defendant. This case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion for summary judgment (Docket # 34) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to seal (Docket # 51) is **GRANTED**.

**FINALLY, IT IS ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 3rd day of May, 2021.

BY THE COURT

_____

NANCY JOSEPH
United States Magistrate Judge